Filed 12/27/21  P. v. Ellis CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BYRON ELLIS,<br><br>    Defendant and Appellant. | B309298<br><br>(Los Angeles County<br>Super. Ct. No. BA465051) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Affirmed.

Christopher Muller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Byron Ellis was convicted by a jury of one count of criminal threats and one count of assault by means of force likely to produce great bodily injury. The jury also found that Ellis personally inflicted great bodily injury upon the victim of the assault. The trial court sentenced Ellis to an aggregate term of seven years in state prison.

On appeal, Ellis raises the following claims: (1) Trial counsel violated Ellis's Sixth Amendment rights by conceding his guilt to the lesser included offense of simple assault over Ellis's express objection; (2) the trial court erroneously denied Ellis's motion to substitute his trial counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); (3) the trial court erred in denying a self-representation request Ellis made in the midst of jury selection; and (4) the People committed prosecutorial misconduct during rebuttal argument by (a) vouching for the credibility of a responding officer who testified at trial and (b) claiming it was unnecessary to have a forensic specialist examine the knife allegedly used in the instant offenses because it likely did not have any fingerprints or DNA on it.

Ellis's first claim of error fails because he does not show that his trial counsel did in fact concede his guilt. Ellis also fails to demonstrate the trial court abused its discretion in denying his *Marsden* motion because he has not established defense counsel pursued a strategy inconsistent with Ellis's claim of innocence. Further, we conclude that any error in denying Ellis's untimely self-representation motion is subject to the harmless error standard generally applicable to violations of state law and that Ellis fails to satisfy that standard. Lastly, Ellis forfeited his claim of prosecutorial misconduct, he has not persuaded us to exercise our discretion to excuse the forfeiture of this claim, and

2

he has not shown that his trial attorney's failure to preserve this appellate claim amounts to ineffective assistance of counsel. Finding no reversible error, we affirm the judgment in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize only those facts that are pertinent to this appeal.

On February 23, 2018, the People filed an information charging Ellis with one count of criminal threats, in violation of Penal Code[1] section 422, subdivision (a) (count 1); and one count of assault by means of force likely to produce great bodily injury, in violation of section 245, subdivision (a)(4) (count 2). The information included several enhancement allegations, including the allegation that in connection with count 2, Ellis personally inflicted great bodily injury upon the victim within the meaning of section 12022.7, subdivision (a). Ellis thereafter pleaded not guilty to both counts and denied the enhancement allegations.

At trial, the People offered evidence that at 3:00 a.m. on January 25, 2018, C.B., a resident of an independent living facility, was asleep on the floor of the living room of the main building of the facility.[2] Ellis, another resident of the facility, entered the building, straddled C.B., pressed a knife to C.B.'s neck, used his other hand to squeeze C.B.'s neck, and threatened C.B. C.B. was eventually able to push Ellis off of him and run to the facility manager's bedroom. C.B. cut his thumb in the

---

[1] Undesignated statutory citations are to the Penal Code.

[2] The remainder of this paragraph and the following paragraph summarize relevant aspects of the evidence offered by the People.

3

process of extricating himself from Ellis.  Ellis threw the knife in a sink and exited the building.

C.B. later contacted the police, who arrived and arrested Ellis.  Upon arriving at the scene, a responding officer, Officer Dennis Dilliner (Officer Dilliner), noticed that C.B. had marks on his neck consistent with strangulation.

The People called, inter alia, C.B., Officer Dilliner, and the facility manager to testify at trial.  The defense did not present any witnesses.  At the conclusion of the trial, the jury found Ellis guilty on counts 1 and 2, and, in connection with count 2, the jury found that Ellis personally inflicted great bodily injury upon C.B. for the purposes of section 12022.7, subdivision (a).

Several months after the jury rendered its verdict but before he was sentenced, Ellis moved, pro per, for a new trial. Ellis argued, among other things, that when he entered the main building on the evening in question, he believed that C.B. was attempting to commit suicide, and that C.B. "sustained a laceration or cut finger" as Ellis sought to "disarm" C.B.  When the court heard Ellis's new trial motion, Ellis reiterated his theory that he believed C.B. was trying to commit suicide.  Ellis also claimed that he did not "attack" C.B., he and C.B. were "struggling," and he "wrestled the knife from" C.B.  Ellis further asserted that he "grabbed [C.B.'s] hand and made him drop the knife or whatever he had in his hand . . . ."  The court ultimately denied the new trial motion.

On January 31, 2020, the trial court sentenced Ellis to an aggregate term of seven years in state prison, which is comprised of a four-year prison sentence on count 2, along with a three-year enhancement on that count pursuant to section 12022.7,

4

subdivision (a).  The trial court also imposed, but stayed pursuant to section 654, a four-year prison sentence on count 1.

On December 21, 2020, we granted Ellis relief from default for his failure to file a timely notice of appeal.  Ellis filed a notice of appeal the following day.

## DISCUSSION

**A.    Ellis's Trial Attorney Did Not Violate Ellis's Sixth Amendment Right to Effective Assistance of Counsel by Conceding Ellis's Guilt**

In *McCoy v. Louisiana* (2018) 138 S.Ct. 1500 (*McCoy*), the United States Supreme Court held that the Sixth Amendment to the federal constitution guarantees that when a criminal defendant "expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt.  [Citations.]"  (See *McCoy, supra*, at p. 1509, quoting U.S. Const., 6th Amend.)  *McCoy* explained that, "[t]o gain assistance [of counsel under the Sixth Amendment], a defendant need not surrender control entirely to counsel."  (See *id.* at p. 1508.) "Some decisions . . . are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal."  (*Ibid.*)  Conversely, "[t]rial management is the lawyer's province:  Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citation.]"  (*Ibid.*)  The high court reasoned that deciding whether to insist on maintaining the defendant's innocence of a crime fell in the category of decisions reserved for that defendant

5

because it is not merely a "strategic choice[ ] about how best to *achieve* a client's objectives" but is instead a "choice[ ] about what the client's objectives in fact *are*."  (See *ibid.*)

The *McCoy* court found that defense counsel violated his client's "[a]utonomy to decide . . . the objective of the defense" by "admit[ting his] client's guilt of a charged crime over the client's intransigent objection to that admission."  (See *McCoy, supra,* 138 S.Ct. at pp. 1508, 1510, 1512.)  There, the defendant was charged with three counts of first degree murder and the prosecutor gave notice of intent to seek the death penalty.  (*Id.* at pp. 1505–1506.)  The defendant's attorney concluded that the evidence against his client was "overwhelming and that, absent a concession at the guilt stage that [the accused] was the killer, a death sentence would be impossible to avoid at the penalty phase."  (*Id.* at p. 1506.)  The defendant told his lawyer " 'not to make that concession' " and demanded that his attorney "pursue acquittal"; the defendant also later informed the trial court (out of the presence of the jury) that he did not consent to his lawyer's strategy.  (See *id.* at pp. 1506–1507.)

Nonetheless, defense counsel told the jury during his opening statement that "there was 'no way reasonably possible' that they could hear the prosecution's evidence and reach 'any other conclusion than [his client] was the cause of these individuals' death[,]' " and that "the evidence is 'unambiguous,' '[his] client committed three murders.' [Citation.]"  (See *McCoy, supra,* 138 S.Ct. at pp. 1506–1507.)  "In his closing argument, [the attorney] reiterated that [his client] was the killer," and stated that the attorney " 'took [the] burden off [the prosecutor]' " on that issue.  (See *id.* at p. 1507.)  The jury returned a unanimous verdict of guilty of first degree murder on all three

6

counts, and later returned three death verdicts. (*Ibid*.) The Supreme Court held that counsel's concession of guilt violated the defendant's "Sixth Amendment-secured autonomy" right, reversed the conviction without conducting a harmless error analysis because this constitutional violation was a " 'structural' " error, and remanded the matter for the defendant to obtain a new trial. (See *id*. at pp. 1510–1512.)

Ellis contends that the *McCoy* decision requires that his convictions be reversed because, over Ellis's objection, his counsel "conceded to the jury that Ellis did attack" C.B., which constituted an admission that Ellis committed the lesser included offense of simple assault. In particular, Ellis points out that his counsel "told the jury during opening, 'there's no doubt that these two struggled'; '[t]he question is whether or not Mr. Ellis is the one who assaulted [C.B.] or whether [C.B.] . . . attacked or confronted Mr. Ellis.' " Ellis asserts his attorney "surmised [during the opening statement] that the 'struggle[]' 'may have been over a disagreement earlier on that day' or '[i]t may have been because they didn't like each other[,]' " and that " 'the question' was who 'initiated' the 'attack.' " Ellis claims his counsel later "foreclosed any argument that the 'attack' was initiated by [C.B.]" by failing to request a self-defense instruction or refer to the elements of self-defense in his closing argument.

Ellis further maintains that his trial counsel reiterated this concession of Ellis's guilt when, during closing argument, the attorney argued "that 'it probably did not go down the way [C.B.] said.' " Ellis also observes his attorney argued: " 'There is no doubt that these two had an altercation. . . . The question is did it go down the way [C.B.] said?' " and " 'I'm not saying that

7

nothing happened between these two men. I'm saying it didn't go down the way [C.B.] said it did.' "

The transcript excerpts quoted in Ellis's briefing indicate only that his trial counsel argued vaguely that there was a " 'struggle' " and an " 'altercation' " between Ellis and C.B., and that one of them had " 'attacked or confronted' " the other and had " 'initiated' " the attack or confrontation. In fact, the attorney's assertion there was a " 'struggle' " and an " 'altercation' " between Ellis and C.B. is compatible with Ellis's theory that he "wrestled the knife" from C.B. in order to "disarm" C.B. and prevent him from committing suicide, and that the two men were "struggling" with each other during their encounter. During the proceedings below, Ellis emphatically contended that his factual theory established that he "didn't do it," yet he now argues that statements made by trial counsel that are consistent with that theory somehow amounted to a concession of guilt.

In any event, Ellis has not shown that the aforesaid arguments of counsel constitute an admission that Ellis perpetrated *any* of the essential elements of a simple assault. The jury instruction for misdemeanor assault—the accuracy of which Ellis does not contest—lists the following elements of the offense: "1. A person willfully committed an act which by its nature would probably and directly result in the application of physical force on another person; [¶] 2. The person committing the act was aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act that physical force would be applied to another person; and [¶] 3. At the time the act was committed, the person committing the

8

act had the present ability to apply physical force to the person of another."[3]

It is not apparent that Ellis's mere "struggl[ing]" with C.B. in some undisclosed fashion or Ellis's being on the receiving end of an altercation, attack, or confrontation—all of which were possibilities under his attorney's theory of the case—would constitute Ellis's willful commission of an act which by its nature would probably and directly result in the application of physical force on C.B. Nor is it apparent that trial counsel's statements established Ellis's awareness of facts that would lead a reasonable person to realize the application of force would be the direct, natural, and probable result of any act undertaken by Ellis, or that he had the ability to apply physical force to C.B.'s person.

Furthermore, nothing in the misdemeanor assault instruction indicates that, in the absence of a self-defense instruction, trial counsel's vague factual theory leads to the conclusion that Ellis was the assailant. Regardless, we reject that assertion because Ellis does not support it with any citation to authority. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a

---

[3] Courts have referred to "simple assault" and "misdemeanor assault" interchangeably. (See, e.g., *People v. Leal* (2009) 180 Cal.App.4th 782, 791–792 [concluding the trial court did not err in declining to instruct the jury on "simple assault" even though the defendant agreed to waive the statute of limitations on "misdemeanor assault"]; *In re Brandon T.* (2011) 191 Cal.App.4th 1491, 1494 [referring to "simple assault" as "a misdemeanor offense"].)

particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]"].)

Moreover, Ellis's trial counsel's statements stand in stark contrast to those in *McCoy*. As noted above, the attorney in *McCoy* told the jury in no uncertain terms that his client " 'committed three murders' " and "there was 'no way reasonably possible' that they could hear the prosecution's evidence and reach 'any other conclusion than [his client] was the cause of these individuals' death.' [Citation.]" (See *McCoy*, *supra*, 138 S.Ct. at pp. 1506–1507.) Conversely, as noted above, trial counsel's statements to the jury in no way relieved the People of their burden to prove beyond a reasonable doubt that Ellis perpetrated the assault. And, although Ellis may not agree with his attorney's theory of the case, that theory was nonetheless a matter of "[t]rial management" that was "the lawyer's province . . . ."[4] (See *McCoy*, *supra*, at p. 1508; see also *id.* at pp. 1508, 1510 [noting that "decisions such as 'what arguments to pursue' " are in the lawyer's province, and indicating that mere "strategic disputes" between the client and the attorney do not constitute "intractable disagreements about the fundamental objective of the defendant's representation"].) Thus, Ellis has failed to demonstrate that trial counsel violated his Sixth Amendment right to decide the objective of his defense.

---

[4] Aside from his assertion that trial counsel conceded his guilt, Ellis does not contend that the attorney rendered constitutionally ineffective assistance by making the statements discussed in this part (i.e., that these statements otherwise amount to constitutionally deficient performance that prejudiced him).

10

## B.    Ellis Fails to Establish the Trial Court Erred in Denying His *Marsden* Motion

"In California, the 'seminal case regarding the appointment of substitute counsel is *Marsden, supra,* 2 Cal.3d 118, which gave birth to the term of art, a "*Marsden* motion." ' [Citation.]" (*People v. Sanchez* (2011) 53 Cal.4th 80, 86.)  Under *Marsden* and its progeny, " 'substitute counsel should be appointed when . . . the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation.]' [Citation.]"  (See *Sanchez*, at p. 89.)  "We review the trial court's denial of defendant's *Marsden* motion under the abuse of discretion standard."  (*People v. Orey* (2021) 63 Cal.App.5th 529, 568.)

Ellis contends the trial court abused its discretion in denying a *Marsden* motion Ellis made during jury selection.  Ellis argues that "the failure to replace [his counsel] at [Ellis's] request" would—and ultimately did—substantially impair his right to assistance of counsel because it was "clear" that Ellis's attorney intended to "manage the trial in a manner at odds with his client's stated objective of maintaining innocence . . . ."  He claims to have given the trial court "examples of how" his attorney "was constructing a defense at odds with his assertion of innocence"—i.e., trial counsel did not plan on introducing into evidence a call Ellis made to police after the incident or certain "police body-camera footage that Ellis believed would undercut

11

[C.B.'s] claims." Ellis asserts that the trial court's denial of his motion resulted in "the violation of Ellis's right" under *McCoy* to have "an attorney who w[ould] make his tactical decisions *in service of* . . . the objective of maintaining innocence."[5]

As we explained in Discussion, part A, *ante*, Ellis fails to show that after his *Marsden* motion was denied, his counsel actually did pursue a strategy incompatible with his claim of innocence. Further, Ellis admits that his trial counsel "was free, as Ellis's representative, to make tactical trial decisions[,] . . . including with respect to whether or how to introduce the 911 call into evidence." (See also *McCoy*, *supra*, 138 S.Ct. at p. 1508 ["Trial management is the lawyer's province . . . ."].) Additionally, although trial counsel's failure to introduce the call and the body camera footage could theoretically form the basis of a claim of ineffective assistance, that omission does not itself demonstrate that trial counsel did not share Ellis's objective of maintaining his innocence.[6] Consequently, Ellis has not shown

---

[5] Although Ellis notes in passing that prior to the instant *Marsden* motion, he made several *Marsden* motions and a motion to represent himself, he does not challenge the trial court's rulings on these previous motions or claim they have any bearing on whether the court abused its discretion in denying the *Marsden* motion at issue. Hence, we need not address this issue further. (See *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1396–1397 [" 'To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis.' [Citation.]"].)

[6] Ellis suggests his trial counsel erroneously believed that these two items of evidence were inadmissible. Yet, Ellis does not contend that trial counsel's failure to introduce this evidence

that the trial court abused its discretion in denying his *Marsden* motion.

## C. Any Error in Denying Ellis's Motion to Represent Himself Was Harmless

*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), announced that a criminal defendant has the federal "constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." (See *id.* at pp. 807, 835–836.) Shortly after *Faretta* was decided, our high court stated that "the requirement of a pretrial motion . . . is a workable and appropriate predicate to the exercise of the *Faretta* right." (See *People v. Windham* (1977) 19 Cal.3d 121, 127 (*Windham*).) Specifically, *Windham* held that "in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial. Accordingly, when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be." (*Id.* at pp. 127–128, fn. omitted.)

---

amounted to constitutionally inadequate performance such that the trial court should have granted his *Marsden* motion. Rather, Ellis's briefing indicates that his discussion of the call and the footage is merely intended to show that "his attorney was pursuing a strategy inimical to his 'defense' 'that [he] may be innocent.' "

13

Conversely, "once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court." (*Windham*, *supra*, 19 Cal.3d at p. 128.) "Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Ibid.*)

*Windham* explained "[t]he rationale underlying the Supreme Court's decision in *Faretta* . . . . is that the state may not constitutionally prevent a defendant charged with commission of a criminal offense from controlling his own fate by forcing on him counsel who may present a case which is not consistent with the actual wishes of the defendant." (See *Windham*, *supra*, 19 Cal.3d at p. 130.) Our Supreme Court also stated it did "not think that . . . the procedural rule [it had] set forth . . . conflict[s] with that rationale in any way." (See *ibid.*) The high court thus characterized requests subject to the abuse of discretion standard announced in *Windham* as "nonconstitutionally based motions for self-representation." (See *id.* at pp. 128–129 & fn. 6.) Our Supreme Court continued to adhere to this reading of *Faretta* in subsequent decisions. (See *People v. Bloom* (1989) 48 Cal.3d 1194, 1220 ["A request for self-representation asserted for the first time after trial has commenced . . . is 'based on nonconstitutional grounds' [citation] and is addressed to the sound discretion of the trial court

14

[citation]. . . . [¶] . . . [¶] . . . [D]efendant's midtrial motion for self-representation did not have a constitutional basis," quoting *Windham*, at p. 129, fn. 6]; *People v. Hamilton* (1988) 45 Cal.3d 351, 369 [concluding that "[b]ecause defendant's request was filed in the midst of the jury's guilt phase deliberations, it was not timely for purposes of invoking an absolute right of self-representation under *Faretta*"].)

Ellis complains that the trial court abused its discretion by denying his request to represent himself "on the ground that there was no one available with knowledge of the case to serve as standby counsel." Ellis concedes he made this request after jury selection began, and he does not dispute the Attorney General's assertion that Ellis did not timely invoke his *Faretta* right to self-representation. (See also *Reygoza v. Superior Court* (1991) 230 Cal.App.3d 514, 519 & fn. 4 (*Reygoza*) [criminal case in which the Court of Appeal assumed that an assertion made by respondent was correct because "defendant did not dispute respondent's claim in his reply"]; *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 (*Rudick*) [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].) Ellis further claims that the alleged erroneous denial of his self-representation request is reversible per se and that, in any event, he has shown that the court's error was not harmless. As discussed below, the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, applies and Ellis fails to satisfy that standard. We thus reject this claim of error without determining whether the trial court abused its discretion in denying Ellis's self-representation request.

Although Ellis acknowledges that "[t]he lower California courts appear generally to have concluded that 'untimely' motions for self-representation *are* subject to harmless error review," he claims "[t]he premise [ ]that untimely self-representation requests are non-constitutional[ ] does not follow from the relevant U.S. Supreme Court caselaw . . . ." Ellis has not directed us to any United States Supreme Court decision that disagrees with *Windham*'s holding that an untimely *Faretta* motion "is based on nonconstitutional grounds" (see *Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6), nor is it apparent the Supreme Court has issued any such decision. *Windham*'s holding on this point is thus binding on us. (See *Tanguilig v. Bloomingdale's, Inc.* (2016) 5 Cal.App.5th 665, 673 ["[I]n the absence of a subsequent contrary decision of the United States Supreme Court, we are bound by the California Supreme Court's holding on [an] issue of federal law . . . ."].) Because Ellis does not argue that any other provision of federal law governs his claim of error, whether this claim is subject to harmless error review is a matter of state law.[7]

---

[7] Ellis cites certain United States Supreme Court decisions for the proposition that "a harmless error rule" does not "make sense" in this context. (Citing *McCoy*, *supra*, 138 S.Ct. at p. 1511; *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 148–151; *McKaskle v. Wiggins* (1984) 465 U.S. 168, 177–178, fn. 8 (*McKaskle*).) Ellis does not explain why we would be bound by decisions describing structural error based on constitutional grounds if we were to conclude, as we already have, that his appellate claim merely asserts error on a nonconstitutional ground. We thus need not address this argument further. (See *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 (*Hodjat*) ["[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case."]; *People v. Sanghera* (2006) 139 Cal.App.4th 1567,

"Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies.' [Citations.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 973.) Ellis argues automatic reversal is nonetheless appropriate under *People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*), because the trial court's ruling abridged a right that is "fundamental to 'orderly legal procedure' rather than simply a protection against erroneous conviction, or [a right whose denial] 'defies ordinary harmless-error analysis.' " (Quoting *Blackburn*, at pp. 1133–1134.) Ellis further contends that the denial of his untimely motion " 'involve[s] [a] fundamental "structural defect[ ]" ' ' ' "analogous to those to which the United States Supreme Court referred in its *Arizona v. Fulminante* . . . decision[,]' " presumably because " 'the right to self-representation at trial' " is mentioned in that decision. (Quoting *People v. Lightsey* (2012) 54 Cal.4th 668, 699 (*Lightsey*) & *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 (*Fulminante*).)

Ellis fails to establish that *Watson*'s generally applicable standard does not govern his claim of error. Notwithstanding Ellis's apparent contention to the contrary, *Blackburn* did not hold that an error warrants automatic reversal simply because assessing the harm resulting therefrom " 'would pose insurmountable difficulties' " and thus defy harmless error analysis. (Quoting *Blackburn*, *supra*, 61 Cal.4th at pp. 1133–1134.) Rather, *Blackburn* held that the deprivation of "*a basic protection* 'whose precise effects are unmeasurable' *and* whose denial 'def[ies] analysis by "harmless-error" standards' " "can

---

1573 ["Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error."].)

17

entail a 'miscarriage of justice' " calling for automatic reversal. (See *Blackburn*, at pp. 1132, 1135, italics added.)  There, our Supreme Court found that a trial court's failure to secure a mentally disordered offender's waiver of his right to a jury trial on whether to extend the offender's involuntary commitment was the denial of just such a basic protection.  (See *id.* at pp. 1116–1117, 1132–1136.)  Ellis does not explain why the rejection of his untimely request to represent himself is akin to the error at issue in *Blackburn*, nor does *Blackburn* seem to be apposite.  (See *Hodjat*, *supra*, 211 Cal.App.4th at p. 10 ["[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case."].)

Additionally, "the right to self-representation at trial" referenced in *Fulminante* was the right established by the *Faretta* decision.  (See *Fulminante*, *supra*, 499 U.S. at p. 310, citing *McKaskle*, *supra*, 465 U.S. at pp. 177–178, fn. 8; *McKaskle*, at pp. 177–178, fn. 8, citing *Faretta*, 422 U.S. at p. 834, fn. 46.) *Windham* in turn held that conditioning a defendant's exercise of his constitutional right of self-representation on the timely exercise thereof does not "conflict with th[e] rationale" of *Faretta*—i.e., "that the state may not constitutionally prevent a defendant charged with commission of a criminal offense from controlling his own fate by forcing on him counsel who may present a case which is not consistent with the actual wishes of the defendant."  (See *Windham*, *supra*, 19 Cal.3d at p. 130.) Because *Windham* indicates that *Faretta*'s rationale does not extend to untimely self-representation motions, it is not apparent that the denial of such a motion is sufficiently "analogous" to the infringement of a *Faretta* right to constitute a structural defect under state law.  (See *Lightsey*, *supra*, 54 Cal.4th at p. 699.)  Ellis

makes no attempt to reconcile *Windham*'s reasoning with his argument that automatic reversal is required, nor does he claim that the denial of his untimely self-representation motion prevented the trial from " ' "reliably serv[ing] its function as a vehicle for determination of guilt or innocence" ' " or barred his " ' "criminal punishment [from] be[ing] regarded as fundamentally fair." ' [Citation.]" (See *Lightsey*, at pp. 700–701 [describing errors that constitute structural defects].)

Because Ellis fails to show that the trial court's supposed erroneous denial of his motion entitles him to automatic reversal of the judgment, *Watson*'s harmless error standard governs this claim of error.[8] The *Watson* "standard requires [a court] to evaluate whether the defendant has demonstrated that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citations.]" (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 195; see also *id.* at p. 201 ["Because we are addressing state law error, defendants must show that a different result was reasonably probable under the *Watson* standard."].) "Appellate review under *Watson* . . . . focuses not on what a

---

[8]  (See *People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058 ["The erroneous denial of an untimely *Faretta* motion is reviewed under the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]."]; *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1050 ["[W]e conclude that although the court erred in its handling of [the defendant's] request under [*Windham*], this error is not automatically reversible, but is reviewed under the 'harmless error' test of *Watson*."]; see also *People v. Lujano* (2014) 229 Cal.App.4th 175, 190 [" ' "[W]e ordinarily follow the decisions of other districts without good reason to disagree." ' [Citation.]"].)

reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration."  (*People v. Breverman* (1998) 19 Cal.4th 142, 177.)

Ellis does not satisfy this standard.  He argues that because his "request was erroneously denied, [his trial counsel] was permitted to—and did—then conduct the entire defense on the improper premise that Ellis was not, in fact, innocent of attacking [C.B.]"  For the reasons provided in Discussion, parts A and B, *ante*, Ellis does not establish that his trial counsel conducted the defense based on this allegedly improper premise. In addition, although Ellis suggests the People's case was weak because of "the lack of . . . forensic evidence, the case's dependence on a small number of biased witnesses, and . . . several important inconsistencies in the State's proof" (e.g., the facility manager disavowed a statement he supposedly made to a defense investigator that he disliked Ellis and thought he was a bad guy), Ellis does not claim the People's evidence would have been any different had he been allowed to represent himself. Thus, Ellis has not shown it is reasonably probable that a result more favorable to him would have been reached if the trial court had granted his self-representation request.

**D.    Ellis Forfeited His Prosecutorial Misconduct Claim, and He Does Not Establish That Trial Counsel's Failure to Preserve This Claim Amounts to Ineffective Assistance of Counsel**

Ellis contends the prosecutor committed misconduct by making the following statements during rebuttal argument: (1) "telling the jury that [the responding officer, Officer] Dilliner was 'an honest officer' who was 'not going to get up here and jeopardize his career to come and make stuff up for you guys' "; and (2) "[t]he prosecutor also attempted to explain the officer's failure to submit the knife for confirmatory laboratory testing by stating that, in the circumstances," (i.e., "a knife found in the sink with no obvious blood traces on it"), " 'there's probably no prints on it, [or] DNA on it,' and 'there's probably no evidentiary value.' " Ellis argues that the statements identified in item (1) constitute "improperly vouch[ing] for Dilliner's credibility by referring to facts not in evidence and by invoking [the prosecutor's] personal prestige in support" of the officer, and that the statements provided in item (2) refer to facts not in evidence.

Ellis concedes that trial counsel did not object to these statements, and he does not dispute the Attorney General's claim that his attorney did not ask the trial court to admonish the jury to disregard these statements.[9] Accordingly, unless Ellis

---

[9] (See also *Reygoza, supra,* 230 Cal.App.3d at p. 519 & fn. 4 [criminal case in which the Court of Appeal assumed that an assertion made by respondent was correct because "defendant did not dispute respondent's claim in his reply"]; *Rudick, supra,* 41 Cal.App.5th at pp. 89–90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].)

establishes that an exception to the forfeiture rule applies, his counsel's failure to preserve this claim of prosecutorial misconduct is fatal. (See *People v. Williams* (2017) 7 Cal.App.5th 644, 686 (*Williams*) [" 'As a general rule, " '[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' " ' [Citation.]"].)

Ellis seeks to invoke our discretion to excuse the forfeiture of his prosecutorial misconduct claim, arguing that review is necessary to "reinforce" the principle that prosecutors have a " 'duty to see that the defendant has a fair and impartial trial, and that he be not convicted except by competent and legitimate evidence.' [Citation.]" Because nearly every unpreserved claim of prosecutorial misconduct implicates this duty, Ellis has not identified a persuasive reason for us to exercise our discretion to review his claim of error.[10] (See *People v. Connors* (2016) 3 Cal.App.5th 729, 737 [" ' "[D]iscretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. [Citations.]" [Citation.]' [Citation.]"].)

Notwithstanding Ellis's forfeiture of his prosecutorial misconduct claim, we may still grant relief if trial counsel's failure to preserve that claim constituted ineffective assistance.

---

[10] Ellis does not argue that we should excuse his trial counsel's failure to preserve his claim of prosecutorial misconduct on the ground that "an objection would have been futile, or [that] an admonition would not have cured the harm caused by the prosecutor's statement[s]." (See *Williams*, *supra*, 7 Cal.App.5th at p. 686.)

(See *People v. Espiritu* (2011) 199 Cal.App.4th 718, 725–726.)
" 'An ineffective assistance claim has two components:  A
[defendant] must show that counsel's performance was deficient,
and that the deficiency prejudiced the defense.'  [Citations.]"
(*In re Gay* (2020) 8 Cal.5th 1059, 1073.)  "To obtain relief, [the
defendant] must demonstrate 'a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding
would have been different.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.'
[Citations.]"  (*Id.* at p. 1086.)

Because Ellis has not demonstrated that he suffered
prejudice from trial counsel's failure to preserve Ellis's claim of
prosecutorial misconduct, we reject his ineffective assistance
claim without determining whether counsel's performance was
deficient.[11]  (See *People v. Mesa* (2006) 144 Cal.App.4th 1000,
1008 ["In considering a claim of ineffective assistance of counsel,
it is not necessary to determine ' "whether counsel's performance
was deficient before examining the prejudice suffered by the
defendant as a result of the alleged deficiencies . . . .  If it is easier
to dispose of an ineffectiveness claim on the ground of lack of
sufficient prejudice, which we expect will often be so, that course
should be followed." '  [Citation.]"].)  Ellis seems to argue that his

_____

[11]  Ellis suggests that we should consider the effect of the
prosecutor's statements "in cumulation with the other errors
cited [in his briefing], which permitted the defendant's own
attorney to concede his guilt and construct his defense on that
basis."  Irrespective of whether Ellis's other appellate claims may
be considered when assessing the instant claim, Ellis's ineffective
assistance claim would still fail because he has not shown his
attorney conceded guilt and constructed Ellis's defense on that
basis.  (See Discussion, parts A–B, *ante.*)

23

trial counsel's failure to preserve his claim of prosecutorial misconduct undermines confidence in the judgment because there is a reasonable probability that, had counsel objected to, and sought an admonition regarding, the aforesaid statements, one or more of the jurors would have believed Officer Dilliner was lying when he "opin[ed] that [C.B.'s] neck marks were 'consistent with' strangulation." Specifically, Ellis claims Officer Dilliner was "[t]he only potentially unbiased witness for the State," but that the prosecutor improperly vouched for Officer Dilliner's credibility, and that the officer's failure to "submit the knife for any kind of confirmatory forensic analysis" suggests he "rushed to judgment" and undermines "his objectivity." Ellis also apparently argues that in the absence of an objection and a curative admonition, the prosecutor's statements about the knife persuaded the jury to believe it was the weapon used to cut C.B. even though it had no visible traces of being tied to the assault (e.g., no blood was found on it).

Without any other evidence of bias on the part of Officer Dilliner (e.g., that he somehow knew Ellis from a prior encounter), it strains credulity to believe that, if trial counsel had objected to, and sought an admonition concerning, the prosecutor's claims that the officer would be punished if he lied and that the knife probably had no forensic evidence thereon, any of the jurors would have believed that Dilliner fabricated his testimony that C.B.'s neck marks were consistent with strangulation. Additionally, Ellis does not cogently argue what effect the prosecutor's statements regarding the knife had on whether the jury believed Ellis used it for the assault. This is because Ellis does not explain why there is any reasonable probability that, had trial counsel challenged the statements at

24

issue, one or more jurors would have suspected (a) there was exculpatory evidence on the knife that Officer Dilliner somehow suppressed or failed to uncover, or (b) the knife was not the one that cut C.B.'s thumb.[12]  In short, Ellis has not established a reasonable probability that trial counsel's failure to object to, and request a curative instruction regarding, the prosecutor's comments had any impact on the weight the jury accorded to Officer Dilliner's testimony or the inferences the jury drew from the fact the officer did not submit the knife for forensic testing.

Ellis does not dispute the Attorney General's observations that the complained of statements were "brief" and that the prosecutor did not repeat them.[13]  Furthermore, the trial court instructed the jury that "[s]tatements made by the attorneys during the trial are not evidence," the jurors "are the sole judges of the believability of a witness and the weight to be given the testimony of each witness," and the jury "must decide all questions of fact in this case from the evidence received in this trial and not from any other source."  These jury instructions and the brevity of the prosecutor's statements mitigate any theoretical prejudice Ellis may have suffered from those statements.  (Cf. *People v. Blacksher* (2011) 52 Cal.4th 769, 838–839 [indicating that instructing the jury to rely only "on evidence presented in court and not treat counsel's comments as evidence" mitigated the impact of a prosecutor's suggestion that he had evidence in his possession supporting his case but did not present

---

[12]  Indeed, in light of Ellis's factual theory that C.B. "sustained a laceration or cut finger" when Ellis "wrestled [a] knife from him," neither (a) nor (b) seems likely.

[13]  (See also *Reygoza*, *supra*, 230 Cal.App.3d at p. 519 & fn. 4; *Rudick*, *supra*, 41 Cal.App.5th at pp. 89–90.)

25

it]; *People v. Medina* (1995) 11 Cal.4th 694, 759–760 [concluding that even if a prosecutor had improperly appealed to "the jury's passions and prejudices," that misconduct was harmless because the prosecutor's comments were "brief and isolated"].)

In sum, Ellis has forfeited his prosecutorial misconduct claim, and he does not establish that we should exercise our discretion to excuse his forfeiture or that his trial counsel's failure to object to, and ask for an admonition regarding, the prosecutor's statements constituted ineffective assistance of counsel.  Therefore, he is not entitled to appellate relief on this claim of error.

### DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.


BENDIX, J.


We concur:


ROTHSCHILD, P. J.               CRANDALL, J.*

---

    **\*** Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.